1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ROBERT HENRY,

11              Petitioner,              No. CIV S-94-0916 JKS EFB P

12        vs.

13   CHARLES D. MARSHALL,

14              Respondent.              FINDINGS AND RECOMMENDATIONS

15   _____/

16        Petitioner is a state prisoner seeking a writ of habeas corpus.  *See* 28 U.S.C. § 2254.  He

17   proceeds *pro se* and *in forma pauperis*.[1]  *See* 28 U.S.C. § 1915.  Following remand from the U.S.

18   Court of Appeals for the Ninth Circuit, an evidentiary hearing was held on April 20, 21, and 23,

19   _____

20        [1] Petitioner was appointed counsel in July 1995, and was represented by the Federal
     Defender's Office for much of this action, including his successful appeal which resulted in a
     remand for an evidentiary hearing.  However, in August 2008 he filed a motion for new counsel
21   or to proceed pro se.  An *in camera* hearing was held in which the undersigned questioned
     petitioner regarding his reasons for seeking new counsel.  The court explained to petitioner that
22   although he was entitled to counsel at his evidentiary hearing, *Bashor v. Risley*, 730 F.2d 1228,
     1234 (9th Cir. 1984); *see also* Rule 8, 28 U.S.C. foll. § 2254, he was not entitled to choose his
23   counsel.  Neither did petitioner show good cause for a substitution of his attorneys.  Indeed, there
     was no suggestion of a conflict of interest or a breakdown of communication with his appointed
24   attorneys and those attorneys had quite ably represented petitioner.  However, after fully
     admonishing petitioner regarding the effect of appearing pro se and ensuring that petitioner's
25   decision to appear pro se was knowing and voluntary, the undersigned granted petitioner's
     request to proceed pro se.  *Faretta v. California*, 422 U.S. 806, 807; *United States v. Farhad*,
26   190 F.3d 1097, 1099-1100 (9th Cir. 1999).

                                    1

2009 to address whether petitioner has a valid freestanding claim of actual innocence, and specifically, whether petitioner's newly discovered evidence which would suggest that petitioner has such a claim is credible.  For the reasons stated herein, this court finds that petitioner's newly discovered evidence is not credible and that petitioner has not met his burden of affirmatively proving that he is probably innocent.  Accordingly, this court recommends that petitioner's application for a writ of habeas corpus be denied.[2]

FACTUAL BACKGROUND

In 1986, petitioner was convicted of first degree murder with special circumstances and was sentenced to life without the possibility of parole.  The prosecution's theory of the case was that petitioner hired Francis Lee Brewer ("Brewer") to kill Cedric Turner ("Turner"), whom petitioner believed engineered a robbery of him (during a cocaine sale).  In attempting to carry out his contract to kill Turner, Brewer mistakenly shot and killed Andre Johnson ("Johnson").  The prosecution therefore proceeded on a theory of transferred intent.

The following factual background is based on the tentative order issued in this action on January 25, 2005 by United States District Judge Singleton, which was based on facts taken from the September 21, 1998 opinion of the California Court of Appeal.  Many of the facts below were contradicted by the testimony of witnesses at the evidentiary hearing, and petitioner argues that this statement of facts is "for all purposes unreasonable in light of the new evidence" presented at the evidentiary hearing.  *See* Dckt. No. 191 at 5.

Following the robbery of petitioner, petitioner and two relatives, Jeffrey Taggart ("Jeffrey") and Jester Taggart ("Jester"),[3] met at petitioner's house to discuss retaliation.  After petitioner recounted his tale of having been robbed at gunpoint, the three decided to shoot

---

[2]  Petitioner has also filed a motion for bail.  Dckt. No. 192.  As petitioner does not have a valid claim of actual innocence, the undersigned recommends his motion for bail be denied.

[3]  Because there are several witnesses with the surname "Taggart," those witnesses will be referred to by their first names.

Turner.  Petitioner told Brewer that Turner had robbed him of $400 and offered Brewer two "Hubbas" (slang for crack cocaine) to give Turner "a good ass whipping."  According to the Court of Appeal, Brewer fully understood the true meaning of petitioner's request, i.e., to kill Turner.  Brewer immediately went to his girlfriend's house to pick up a .22 caliber sawed-off rifle and ammunition, loaded the gun, placed it in the blue Plymouth he had stolen earlier, and drove to Gateway Drive, the prearranged place for the shooting.

At 6:00 p.m., petitioner and a relative accosted Turner on Gateway Drive and told Turner that they were going "to take him out," and that he "was gonna die."  Petitioner and his relative then left to meet a second relative and then the three, all armed with guns, returned to Gateway Drive.  Petitioner confronted Turner a second time, repeating his threat that Turner was going to die.  Turner retreated to a nearby driveway.  One of petitioner's relatives, in petitioner's presence, warned the gathering crowd to disperse because "somebody's going to get shot."

Turner fled into a nearby house where he met Johnson.  Johnson persuaded Turner to leave saying, "come on, we'll handle it."  Johnson offered Turner a ride to Turner's home, and Turner accepted.  They left the residence together.  Turner entered Johnson's vehicle and sat in the front passenger seat.  In the meantime, Johnson and petitioner engaged in a shouting match and began to push each other.

Meanwhile, Brewer and Bernard Oden ("Oden") arrived at the scene in the blue Plymouth and parked in front of Johnson's car.  Brewer got out of the car and stood on the sidewalk observing the argument between petitioner and Johnson.  Petitioner walked up to Brewer and pointed out Turner saying, "that is the guy."

Thereafter, Brewer, with Oden sitting in the passenger seat, drove down the street, made a U-turn, and stopped in the middle of the street next to Johnson's car.  As one of petitioner's relatives shouted "watch out, he is gonna shoot," Brewer leaned across Oden and fired numerous shots out of the passenger window of the car, hitting and killing Johnson who was standing approximately 5 to 10 feet away.  In the view of the appellate court, the evidence

3

overwhelmingly demonstrated that at the time of the shooting, Johnson was reaching for the door of his automobile and was facing toward the crowd in the street rather than toward the car from which the shots were coming.

After the shooting, Brewer disposed of the murder weapon, wiped the fingerprints off the blue Plymouth, and abandoned the car.  Then, accompanied by Oden, he returned to the crime scene to ascertain if the victim had been shot.  As a next step, Brewer, Oden, and a third man went to petitioner's house on Sawyer street.  Brewer and petitioner discussed the shooting and Brewer assured petitioner that he did not have to worry anymore because he (Brewer) had taken care of the job.  Petitioner told Brewer that he was willing to pay him, but wished to negotiate the price because the wrong person was shot.  They agreed that the price would be reduced from $200 to $100.  The Court of Appeal found this version of the facts corroborated by petitioner's statements to Detective Bawart after petitioner's arrest.  In those statements petitioner said "I hired Lee Brewer to kill Cedric Turner.  He killed the wrong guy.  I can't understand why I am being charged."

Shortly after petitioner's trial, petitioner's cousin, Jester, was tried as an adult and convicted of second degree murder for his role in Johnson's murder, and was sentenced as a juvenile to the California Youth Authority for a term of eight years.  In late 1987/early 1988, Brewer was tried for his role in Johnson's murder, was convicted of second degree murder, and was sentenced to a term of 15 years to life.  An allegation that he had personally used a firearm was found to be not true.

PROCEDURAL HISTORY

Petitioner filed the initial habeas petition in this court on June 9, 1994 and filed an amended petition on July 15, 1999, asserting four claims: (1) "newly discovered" evidence presented at Brewer's trial, subsequent to his own trial, resulted in an inconsistent verdict entitling him to a new trial; (2) his Fifth Amendment rights were violated when the prosecutor pointed out at trial that petitioner had not denied involvement in the murder in his statement to

1   the police, and the trial court gave an instruction on adoptive admissions from silence in the face

2   of accusations; (3) there was insufficient evidence at trial to prove that he hired Brewer to kill

3   Turner, rather than just assault him; and (4) the prosecutor misstated the evidence at trial.  On

4   January 25, 2005, the district judge entered an order tentatively denying the amended petition.

5   By order filed September 7, 2005, the tentative order became final and judgment was entered for

6   respondent.

7        On October 5, 2005, petitioner filed an appeal to the Ninth Circuit.  In the appeal,

8   petitioner argued that the prosecutor's impermissible comment on petitioner's post-arrest silence

9   and the jury instruction on adoptive admissions violated petitioner's Fifth Amendment rights (an

10  issue which was certified for appeal by Judge Singleton); that evidence discovered after

11  petitioner's trial indicates that petitioner was actually innocent of the crime of murder and the

12  special circumstance (an issue which was *not* certified for appeal); and that there was insufficient

13  evidence to support a verdict of guilty on a theory of transferred intent (an issue which was *not*

14  certified for appeal).  Appellant's Opening Br. at *18-35, 2005 WL 4838037 (9th Cir. Dec. 19,

15  2005).   Respondent countered petitioner's first claim, but declined to address petitioner's actual

16  innocence claim and insufficient evidence claim because those issues had not been certified for

17  appeal by Judge Singleton.  Appellee's Br. at *2, n.2, 2006 WL 2630136 (9th Cir. Feb. 22,

18  2006).

19       On May 25, 2007, the Ninth Circuit affirmed the district court's decision with regard to

20  petitioner's first claim on appeal (violation of his Fifth Amendment rights with regard to his

21  post-arrest silence), but remanded to the district court with directions to hold an evidentiary

22  hearing on petitioner's uncertified issue of actual innocence.[4]  The Ninth Circuit stated:

23  ////

24  _____

25       [4]  The Ninth Circuit decided to address petitioner's uncertified actual innocence claim by
    construing the briefing on appeal as a request for an expanded certificate of appealability
    ("COA") and granting the COA.  The panel declined to grant a COA to petitioner's insufficiency

26  of the evidence claim. *Henry v. Marshall*, 224 Fed. Appx. 635, 637 (9th Cir. Mar. 12, 2007).

Henry seeks an evidentiary hearing on his actual innocence claim. Habeas petitioners must meet "a reasonably low threshold" in order to receive an evidentiary hearing, showing only a colorable claim for relief and the lack of a factual finding below. *Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir. 2001). Here, there is no evidence in the record that Henry received an evidentiary hearing in state court to allow the state court to find facts relevant to the newly-discovered evidence. Henry is entitled to an evidentiary hearing in the district court because if the newly-discovered evidence proves to be true, he would have made out a valid freestanding claim of actual innocence by "affirmatively prov[ing] that he is probably innocent." *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997); *Herrera v. Collins*, 506 U.S. 390, 417-19, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). If truthful, the testimony of Jeffrey Taggart and Charles Austin would prove that Henry, while possibly guilty of solicitation, conspiracy, and attempt for hiring a hit man, is not guilty of first degree murder. We therefore remand to the district court to hold an evidentiary hearing.

*Henry v. Marshall*, 224 Fed. Appx. 635, 637 (9th Cir. Mar. 12, 2007). On remand, the district judge referred this matter to the undersigned for the taking of testimony and making of findings and recommendations.

SUMMARY OF EVIDENTIARY HEARING

An evidentiary hearing was held in this action on April 20, 21, and 23, 2009 to address petitioner's actual innocence claim. At the hearing, petitioner offered various exhibits; his own testimony; and the testimony of several witnesses, including Brewer, Mary Gardner ("Gardner"), Jeffrey, Alex Taggart ("Alex"), and Cherry Taggart ("Cherry").[5] Petitioner and respondent also

---

[5] Petitioner did not offer the testimony of Charles Austin at the hearing because Austin could not be located. Petitioner indicated at the hearing that he could not locate a contact address for Austin. The U.S. Marshal made multiple attempts to locate and serve Austin, but was unsuccessful. Petitioner concedes in his post-hearing brief that the court "has utilized the services of the US Marshalls [sic] office to secure Charles Austins [sic] attendance and was not successful despite due diligence." Dckt. No. 188 at 8; *see also* Transcript of Evidentiary Hearing ("EH Tr.") at 356-57.

Petitioner also attempted to call as witnesses Hicks, an investigator who had interviewed Oden, Cramer, a correctional counselor who could testify to petitioner's character in prison, and Kinnicut, the prosecutor at petitioner's trial, who could testify to Oden's inconsistent testimony at petitioner's, Jester's, and Brewer's trials. EH Tr. at 7-20. The court did not allow petitioner to call these witnesses, as Hicks' interviews with Oden were memorialized in his written reports, Cramer had no knowledge of the crime, and Kinnicut's testimony would have only explained

1  stipulated to the admissibility of the state court records from petitioner's trial and from Brewer's

2  trial.

3                                              DISCUSSION

4          Petitioner argues that Brewer did not shoot and kill Johnson, but that Oden, the passenger

5  in Brewer's car, did.  Petitioner argues that this theory is supported by the testimony of Jeffrey,

6  Austin, and Brewer, as well as the testimony of other witnesses and various exhibits offered at the

7  evidentiary hearing.  *See* Pet'r's Post-Hrg. Br. at 8-18.[6]  At Brewer's trial, and again at the

8  evidentiary hearing, Jeffrey, petitioner's brother, testified that he was in the car with Brewer and

9  Oden at the time of the shooting and that Oden was the shooter.  At the evidentiary hearing,

10  Brewer testified that Oden was the shooter.  At Brewer's trial, Austin, who met Brewer in jail

11  prior to Brewer's trial, testified that he saw Oden holding a gun and saw shots fired from the

12  passenger (Oden's) window, and that Brewer looked shocked after the shots were fired.  At the

13  evidentiary hearing, petitioner testified that he had in jest offered Brewer cocaine to beat up

14  Turner, but that neither party took the offer seriously.[7]

15          Respondent counters that petitioner's claim that Oden, not Brewer, shot Johnson and that

16  Oden did so for an independent reason "is fabricated and totally unsupported by any reliable

17  evidence."[8]  Resp.'s Post-Hrg. Br. at 9-10.  Respondent contends that petitioner's witnesses–

18  specifically, his brother Jeffrey, Brewer, and Austin – contradict themselves and each other, and

19  _____

20  what was already recorded in the trial transcripts.

21          [6] The page numbers assigned via the court's electronic filing system (CM/ECF) and the
     page numbers assigned by the parties are often inconsistent.  For ease of reference, all references
22   to page numbers are to those assigned via CM/ECF.

23          [7] Petitioner also argued at the hearing that he is innocent because he did not hire Brewer
     to kill Turner, but merely to beat him up.  The court addresses this argument *infra* at p. 35.

24          [8] Respondent points out that this theory is directly opposite of the defense theory at
     petitioner's trial.  At trial, the defense contended that Brewer shot Johnson and even sought to
25   introduce evidence regarding a prior shooting by Brewer in order to show that Brewer does not
     like to be challenged and that when he was challenged by Johnson, he shot him.  Resp.'s Post-
26   Hrg. Br. at 10 (citing Henry RT at 179-81).

1    are not trustworthy.  *Id.* at 10.

2         Respondent further argues petitioner's own admissions substantially led to his conviction

3    and that any reasonable doubt of petitioner's guilt was eliminated by the totality of the evidence,

4    namely:  the timing and location of the murder and the statements to police by petitioner's

5    brothers and cousin.[9]  Resp.'s Suppl. Pre-Hrg. Br., Dckt. No. 159, at 19.

6         Respondent also argues that regardless of the credibility of the newly discovered

7    witnesses, the newly discovered evidence that Oden was the alleged shooter rather than Brewer is

8    irrelevant because of California's "natural and probable consequences" doctrine.  The gist of

9    respondent's argument is that California law imposes criminal liability upon all persons

10   "concerned" in the commission of a crime and that petitioner was an aider and abettor who was

11   responsible not only for the particular crime that to his knowledge Brewer contemplated

12   committing, but he is also liable for the natural and reasonable consequences of any act that

13   ////

14   ////

---

15    [9]  Petitioner argues that the police interviews of John Henry and Jester Taggart should not

16   be considered by this court because they were not admitted into evidence at his trial and the
     witnesses did not testify at the evidentiary hearing.  Dckt. No. 191 at 25.

17        John Henry, petitioner's brother, told police in a recorded interview that petitioner called

18   him after the shooting and stated that he had hired a man to kill another man, but that he killed
     the wrong guy.  John Henry testified at petitioner's trial and claimed he did not recall making a
     statement to the police at all and denied talking to petitioner.  Henry RT at 268-77.  The

19   interview was excluded at petitioner's trial after a neuropsychologist testified that John Henry
     had a brain tumor, was an alcoholic, and had a "spotty and bizarre memory picture."  *See* EH Tr.,

20   Ex. 8.  Petitioner testified at the hearing that his brother was lying about this telephone call.  EH
     Tr. at 261-62.  Petitioner further argued that John Henry may have been coerced or tricked into

21   making the statement, saying that "the interview starts out with John Henry saying that I called
     the house and made this–allegedly made this statement that the wrong individual was shot.  But

22   the officers on tape seem to be talking to the man before they even taped him.  And I'm just
     wondering what that could have been talking about before he even got on tape . . . .  So I

23   personally believe that a lot of things Detective George Bohert [sic] was doing was not only
     illegal but morally wrong.  He didn't care about these three teenagers that he had in front of

24   him."  EH Tr. at 413.  Jester Taggart, petitioner's cousin, also gave a statement to the police, but
     he did not testify at petitioner's or Brewer's trial and the statement was not admitted in those

25   trials.  Because John Henry's and Jester Taggart's statements to the police were not admitted by
     the trial courts, this court has not considered them in finding that petitioner has failed to meet his

26   burden of proving his actual innocence.

petitioner knowingly aided and encouraged, including Oden's alleged shooting of Johnson.[10]
Resp.'s Post-Hrg. Br., Dckt. No. 189, at 23-24.  However, as discussed below, the court finds that
petitioner has not made a sufficient evidentiary showing that Brewer was not the shooter.
Accordingly, this argument need not be addressed.[11]

I.      Standard of Review

        Petitioner filed his initial application for federal habeas corpus on June 2, 1994, nearly
two years before the enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA").
Accordingly, the substantive provisions of AEDPA do not apply to this case.  *Phillips v.
Woodford*, 267 F.3d 966, 973 (9th Cir. 2001).  Nonetheless, the pre-AEDPA standards are
deferential.  Under pre-AEDPA standards, a federal court presumes the correctness of a state
court's findings of fact and its application of its own law, rather than engage in a *de novo* review.
*Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Estelle v. McGuire*, 502 U.S. 62 (1991).  However, a
federal court reviews questions of law and mixed questions of law and fact *de novo*, owing no
deference to a state court's legal conclusions.  *Williams v. Taylor*, 529 U.S. 400 (2000)
(O'Connor, J., concurring); *McKenzie v. McCormick*, 27 F.3d 1415, 1418 (9th Cir. 1994) (en
banc) ("On habeas review, state court judgments of conviction and sentence carry a presumption
of finality and legality, . . . and may be set aside only when a state prisoner carries his burden of
'proving that [his] detention violates the fundamental liberties of the person, safeguarded against
state action by the Federal Constitution.'").  A petitioner "must convince the district court 'by a

---

[10]  Respondent points out that this theory is directly opposite of the defense theory at
petitioner's trial.  At trial, the defense contended that Brewer shot Johnson and even sought to
introduce evidence regarding a prior shooting by Brewer in order to show that Brewer does not
like to be challenged and that when he was challenged by Johnson, he shot him.  Resp.'s Post-
Hrg. Br. at 10 (citing Henry RT 179-81).

[11]  Respondent also argues that Jeffrey's testimony does not constitute "newly discovered
evidence."  Resp.'s Suppl. Pre-Hrg. Br., Dckt. No. 159, at 7.  However, respondent indicated at
the November 18, 2008 hearing that whether or not the evidence is newly discovered is a not an
issue based on the language in the Ninth Circuit's remand order.  Nov. 18, 2008 Tr., Dckt. No.
148, at 6-7.

1  preponderance of evidence' of the facts underlying the alleged constitutional error." *McKenzie v.*

2  *McCormick*, 27 F.3d at 1418-19 (citing *Johnson v. Zerbst*, 304 U.S. 458, 469 (1938) and *Bellew v.*

3  *Gunn*, 532 F.2d 1288, 1290 (9th Cir. 1976)).

4  II.    Freestanding Actual Innocence – *Herrera v. Collins*

5         The Ninth Circuit remanded this case to the district court to hold an evidentiary hearing

6  regarding petitioner's actual innocence claim.  In doing so, the Circuit stated that if petitioner's

7  newly discovered evidence proves to be true, petitioner "would have made out a valid

8  freestanding claim of actual innocence by 'affirmatively prov[ing] that he is probably innocent,'"

9  and cited two cases supporting that proposition: *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir.

10  1997) and *Herrera v. Collins*, 506 U.S. 390, 417-19 (1993).

11         In *Herrera v. Collins*, 506 U.S. 390, the Supreme Court assumed, without deciding, that a

12  freestanding claim of actual innocence is cognizable under federal law.  In this regard, the court

13  observed that "in a capital case a truly persuasive demonstration of 'actual innocence' made after

14  trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief

15  if there were no state avenue open to process such a claim." *Id.* at 417.  A different majority of

16  the Supreme Court explicitly held that a freestanding claim of actual innocence is cognizable in a

17  federal habeas proceeding.  *Compare* 506 U.S. at 417 with 506 U.S. at 419 and 430-37; *see also*

18  *Jackson v. Calderon*, 211 F.3d 1148, 1165 (9th Cir. 2000) (noting that a majority of the Justices

19  in *Herrera* would have supported a free-standing claim of actual innocence).  Although the

20  Supreme Court did not specify the standard applicable to this type of "innocence" claim, it noted

21  that the threshold would be "extraordinarily high" and  would have to be "truly persuasive."

22  *Herrera*, 506 U.S. at 417.  More recently, the Supreme Court declined to resolve whether federal

23  courts may entertain independent claims of actual innocence but concluded that the petitioner's

24  showing of innocence fell short of the threshold suggested by the Court in *Herrera*.  *House v.*

25  *Bell*, 547 U.S. 518, 554-55 (2006).  Respondent petitioned the Supreme Court for a writ of

26  ////

certiorari on this issue, but the Supreme Court denied certiorari review.[12]

"A habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *Carriger*, 132 F.3d at 476-77; *see also Jackson*, 211 F.3d at 1165.  The petitioner's burden in such a case is "extraordinarily high" and requires a showing that is "truly persuasive."  *Carriger*, 132 F.3d at 476 (quoting *Herrera*, 506 U.S. at 417).

Requiring affirmative proof of innocence is deemed to be appropriate because when a petitioner makes a freestanding claim of innocence, he is claiming that he is entitled to relief despite a constitutionally valid conviction.  *See Carriger*, 132 F.3d at 476.  The court must consider the evidence "in light of the proof of petitioner's guilt at trial."  *Herrera*, 506 U.S. at 418.  Where the veracity of witnesses is at issue, the court must make a credibility determination by listening to the witnesses, testing their story, and gauging their demeanor.[13]  *Earp v. Oronski*,

_____

[12]  Although the Supreme Court has never clearly stated that a freestanding claim of actual innocence in a noncapital case is cognizable on federal habeas corpus review, the Ninth Circuit has assumed in this and other cases that freestanding innocence claims are cognizable in both capital and non-capital cases and has also articulated a minimum standard of proof in order to prevail on such a claim.  *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (en banc); *Osborne v. District Attorney's Office for Third Judicial Dist.*, 521 F.3d 1118, 1131 (9th Cir. 2008), *cert. granted*, 129 S. Ct. 488 (2008).
Here, respondent disputes whether petitioner's freestanding claim is cognizable.  However, because petitioner has not made an adequate evidentiary showing of actual innocence, as discussed below, the court need not address whether the freestanding claim is cognizable.  *Osborne*, 521 F.3d at 1131 ("*Herrera, House, Carriger, and Jackson* all support the practice of first resolving whether a petitioner has made an adequate evidentiary showing of actual innocence before reaching the constitutional question of whether freestanding innocence claims are cognizable in habeas."); *see also Majoy v. Roe*, 296 F.3d 770, 776-77 (9th Cir. 2002) (holding that the evidentiary basis of a petitioner's innocence claim should be developed before considering whether that claim was jurisdictionally barred).

[13]  Respondent argues that when the relief sought at an evidentiary hearing is based on a claim of newly discovered evidence consisting of witness recantations of trial testimony or confessions of others to the crime, most courts decline to consider it in the absence of a showing that the prosecutor knowingly proffered false testimony, failed to disclose exculpatory evidence, or that petitioner's counsel was ineffective.  *Johnson v. Bett*, 349 F.3d 1030 (7th Cir. 2003).  Respondent contends that there is no evidence here, nor even an allegation, that the prosecutor engaged in any such misconduct.  However, it is clear from the remand order that the Ninth Circuit has foreclosed this issue and the district court is to consider the new testimony.

431 F.3d 1158, 1169-1170 (9th Cir. 2005); *see also Carriger*, 132 F.3d at 476 (discussed *infra*).

In evaluating credibility, the court should consider factors such as the opportunity and ability of

the witness to see or hear or know the things testified to; the witness' memory; the witness'

manner while testifying; the witness' interest in the outcome of the case and any bias or

prejudice; whether other evidence contradicted the witness' testimony; the reasonableness of the

witness' testimony in light of all the evidence; and any other factors that bear on believability.

*See* Model Crim. Jury Instr. 9th Cir. 3.9 (2003).

In *Herrera*, the Supreme Court rejected the petitioner's claim of actual innocence.  In

doing so, it explained the petitioner's burden as follows:

> We may assume, for the sake of argument in deciding this case, that
> in a capital case a truly persuasive demonstration of "actual
> innocence" made after trial would render the execution of a
> defendant unconstitutional, and warrant federal habeas relief if
> there were no state avenue open to process such a claim.  But
> because of the very disruptive effect that entertaining claims of
> actual innocence would have on the need for finality in capital
> cases, and the enormous burden that having to retry cases based on
> often stale evidence would place on the States, the threshold
> showing for such an assumed right would necessarily be
> extraordinarily high. The showing made by petitioner in this case
> falls far short of any such threshold.
>
> Petitioner's newly discovered evidence consists of affidavits . . . .
> the affidavits themselves contain inconsistencies, and therefore fail
> to provide a convincing account of what took place on the night
> Officers Rucker and Carrisalez were killed. For instance, the
> affidavit of Raul, Junior, who was nine years old at the time,
> indicates that there were three people in the speeding car from
> which the murderer emerged, whereas Hector Villarreal attested
> that Raul, Senior, told him that there were two people in the car that
> night. Of course, Hernandez testified at petitioner's trial that the
> murderer was the only occupant of the car. The affidavits also
> conflict as to the direction in which the vehicle was heading when
> the murders took place and petitioner's whereabouts on the night of
> the killings.
>
> Finally, the affidavits must be considered in light of the proof of
> petitioner's guilt at trial – proof which included two eyewitness
> identifications, numerous pieces of circumstantial evidence, and a
> handwritten letter in which petitioner apologized for killing the
> officers and offered to turn himself in under certain conditions . . . .

1

> That proof, even when considered alongside petitioner's belated affidavits, points strongly to petitioner's guilt.

2

> This is not to say that petitioner's affidavits are without probative value. Had this sort of testimony been offered at trial, it could have been weighed by the jury, along with the evidence offered by the State and petitioner, in deliberating upon its verdict. Since the statements in the affidavits contradict the evidence received at trial, the jury would have had to decide important issues of credibility. But coming 10 years after petitioner's trial, this showing of innocence falls far short of that which would have to be made in order to trigger the sort of constitutional claim which we have assumed, *arguendo*, to exist.

3

4

5

6

7

8    *Herrera*, 506 U.S. at 417-19.

9    *Carriger* also illustrates the extraordinarily high burden a petitioner attempting to prove a

10   claim of actual innocence must meet–affirmative proof of actual innocence.  132 F.3d at 477.

11   The physical evidence at Carriger's trial was not strong, and the prosecution primarily relied upon

12   the testimony of a witness, Robert Dunbar, who had contacted the police the morning following

13   the murder with an offer of information in exchange for immunity.  *Id.* at 460.  With immunity,

14   Dunbar testified that Carriger had admitted to him committing the crime immediately after it

15   happened.  *Id.*  Almost all of the physical evidence used at trial was evidence to which Dunbar

16   had led police the morning following the crime.  *Id.*

17   Evidence discovered after the trial showed that Dunbar was a career criminal with a

18   pattern of lying to police and shifting blame to others and a long history of violence.  *Id.* at 471-

19   72.  Dunbar later confessed in an evidentiary hearing in Carriger's post-conviction proceedings

20   that he had committed the crime, not Carriger.  *Id.* at 471.  He described the crime scene in detail.

21   *Id.*  At the time, Dunbar was not granted immunity, and acknowledged that he was opening

22   himself to prosecution for capital murder.  *Id.* at 475.  Dunbar's wife also testified at the

23   evidentiary hearing that Dunbar had confessed the crime to her.  *Id.* at 471.  Dunbar also

24   confessed that he had committed the crime in a letter to a woman with whom he corresponded,

25   and to his cellmate.  *Id.* at 471-72.

26   ////

13

1    Dunbar recanted his confession three weeks after the evidentiary hearing. *Id.* at 473. He

2  claimed that the reason that his testimony had been accurate and detailed was that Carriger's

3  lawyers had shown him diagrams of the crime scene. *Id.* The lawyers testified that he had not

4  been shown such diagrams, and his testimony was never explained by any other evidence. *Id.* at

5  475.

6    The Ninth Circuit held that, despite Dunbar's confession, Carriger had not made out a

7  freestanding claim of actual innocence. The court explained:

8          Although the postconviction evidence he presents casts a vast shadow of doubt
           over the reliability of his conviction, nearly all of it serves only to undercut the
9          evidence presented at trial, not affirmatively to prove Carriger's innocence.
           Carriger has presented no evidence, for example, demonstrating he was elsewhere
10         at the time of the murder, nor is there any new and reliable physical evidence, such
           as DNA, that would preclude any possibility of Carriger's guilt. Although
11         Dunbar's confession exonerating Carriger does constitute some evidence tending
           affirmatively to show Carriger's innocence, we cannot completely ignore the
12         contradictions in Dunbar's stories and his history of lying. Accordingly, the
           confession by itself falls short of affirmatively proving that Carriger more likely
13         than not is innocent. Carriger's freestanding claim of actual innocence must fail.

14  *Id.* at 477. Thus, even though another person had made a sworn confession to the crime in open

15  court, and there was little evidence of petitioner's guilt that was not discounted by this confession,

16  petitioner had still failed to meet his burden of making a freestanding claim of actual innocence.

17    Keeping this precedent in mind, the court turns to the evidence in this case.

18  A.    Petitioner's claim that he is innocent because Oden shot Johnson, not Brewer

19    It is undisputed that Andre Johnson was shot and killed on Thanksgiving Day in 1985, that

20  the shots were fired from a stolen car that was occupied by Brewer and Oden, and that Brewer

21  was the driver and Oden was sitting in the passenger seat. Pet'r's Post-Hrg. Br., Dckt. No. 187, at

22  4. The dispute surrounds who fired the gun – Brewer or Oden. Petitioner contends that various

23  evidence shows that Oden was the shooter, including the testimony of Jeffrey at Brewer's trial

24  and in the evidentiary hearing, the testimony of Brewer at the evidentiary hearing, and the

25  ////

26  ////

14

testimony of Austin at Brewer's trial.[14]  For the reasons stated below, the court finds none of

those witnesses are credible[15] and finds that petitioner has not made a showing of actual

innocence under *Herrera* on the ground that Brewer was not the shooter.

        1.      <u>Evidence to support petitioner's claim that Oden was the shooter</u>

           a.     <u>Jeffrey Taggart's testimony</u>

Petitioner contends that Jeffrey's testimony at Brewer's trial and at the evidentiary hearing

supports petitioner's claim of actual innocence.  At Brewer's trial, Jeffrey testified that he was in

Brewer's car at the time of Johnson's shooting and that he saw Oden fire the gun that killed

Johnson.  Brewer RT at 321.  At the evidentiary hearing, Jeffrey testified that he got into

Brewer's car after Johnson pulled out a firearm,[16] that Oden said as they were driving away that

they should turn around because Johnson was "talking too much shit," and that he saw Oden

bring up the gun to shoot, and that he was lying down in the backseat of the car when he heard the

gunshots.  EH Tr. 172, 177, 317.

////

---

[14]  Petitioner also moved for summary judgment on his actual innocence claim, arguing that because the jury in Brewer's trial found Brewer not guilty of firing the gun that killed Johnson, the jury necessarily found the testimony of Austin and Jeffrey to be credible and contending that if the jury found that Brewer did not fire the gun, petitioner cannot be guilty of first degree murder for allegedly hiring Brewer to shoot Turner.  *See* Pet'r's Mot. for Summ. J., Dckt. No. 157, at 2, 15-16.  Petitioner's motion for summary judgment was denied at the evidentiary hearing.  EH Tr. at 25.

[15]  Petitioner notes that the Ninth Circuit stated that if his witnesses' testimony was truthful, their testimony would prove his actual innocence.  He contends that there is a difference between truthfulness and credibility, and then argues that his witnesses need not be credible.  *See* Dckt. No. 192 at 3, n.2.  He points out that the Ninth Circuit was fully aware of Jeffrey's inconsistent statements, as they had been described in his briefing to that court.  Petitioner's distinction is one that lacks meaningful difference.  The court's ultimate goal of determining the truthfulness of a witness' testimony is achieved by assessing the witness' credibility.

[16]  Petitioner points out that this is consistent with Alex's testimony at Brewer's trial that Johnson pulled out a firearm, Henry RT at 211, and at the hearing that at the time of the shooting, he did not recall exactly where Jeffrey was, EH Tr. 164, 165.  Pet'r's Post-Hrg. Suppl. Br., Dckt. No. 188, at 3.  But, these things do not establish that Jeffrey was in the car at the time of the shooting, that he saw the shooting, or that Oden was the shooter.  Accordingly, these consistencies in testimony between the witnesses are of little relevance.

Petitioner notes that Jeffrey's testimony that he was in the car at the time of the shooting is consistent with Brewer's testimony at the hearing that Jeffrey was in the car, EH Tr. 32:7, with Oden's initial statements to the police that Jeffrey was in the car, EH Tr., Ex. 13, and with Mary Gardner's testimony at the hearing that there may have been three or four people in the car, EH Tr. 98-99.[17]  Petitioner also notes that Jeffrey's testimony that Oden was the shooter is consistent with Brewer's testimony that Oden was the shooter, EH Tr. 42:6-10, with Austin's testimony that Oden was the shooter, Brewer RT 650-52, and with Alex's testimony that although he no longer had an independent recollection of it, he had seen the passenger shoot, EH Tr. 146.  Petitioner also notes that Jeffrey's testimony that the shooting was out of the passenger window is consistent with Alex's testimony that the shots came out of the passenger's window, EH Tr. at 133, and that Jeffrey's testimony that Oden said Johnson was talking too much shortly before Oden shot him is consistent with his testimony at Brewer's trial that "Oden didn't like the way [Johnson] was talking," Brewer RT 324.  Therefore, petitioner contends, Jeffrey's testimony should be credited. However, as discussed below, there are many reasons why Jeffrey's testimony is simply not credible.

First, as explained in detail in respondent's post-evidentiary hearing brief, Jeffrey told inconsistent stories during his interview with the Vallejo police, petitioner's trial, Brewer's trial, and at the evidentiary hearing.  Both Jeffrey and petitioner have admitted that some of Jeffrey's statements were lies.  *See*, *e.g.*, Am. Pet., Ex. A (Jeffrey's declaration, stating that he lied at petitioner's and Jester's trials); Dckt. No. 151 at 14 n.3 (petitioner's evidentiary hearing brief noting "[i]ndeed, an examination of the full transcript of Jeff's statement to police shows numerous internal inconsistencies and, at times, a near-incoherence").  For that reason alone, the court finds it difficult to credit Jeffrey's testimony that he was in the backseat of Brewer's car at the time of the shooting and saw that Oden was the shooter, or to find that Jeffrey's testimony

---

[17] Turner also testified that there were four people in the car.  Henry RT at 109.

establishes that petitioner is "probably innocent" of his crimes.

Jeffrey first told the Vallejo police on November 30, 1985 that he was in the North Crest area at approximately 8:00 pm on Thanksgiving evening trying to buy some "weed," that he suddenly heard gunshots, and that he "hit the ground." EH Tr., Ex. S at 2. He told the police that he was a "half mile" from the shooting. *Id.* at 4. During that same interview, Jeffrey then told the police that he was approximately 90 feet from the shooting, but claimed he did not see who did the shooting and had no idea why it occurred. *Id.* at 4-5. Toward the end of the interview, Jeffrey told police that he was standing near Johnson when Johnson was killed and that the shots were fired by Brewer from the driver's side of the car. *Id.* at 36, 41.[18]

Jeffrey admitted that petitioner had been robbed of rock cocaine and money by Turner and another individual; that the robbery led to a meeting involving Jeffrey, his cousin Jester, and petitioner; and that at the meeting, the three of them decided they were "gonna get [Turner]" and were "gonna beat him up." *Id.* at 14-17, 20. When police asked if he, Jester, and petitioner had decided to kill Turner, Jeffrey said, "They probably said they was gonna shoot him." *Id.* at 20. When asked who said they were planning to kill Turner, Jeffrey responded, "Everybody was saying it. We all said it." *Id.*

Jeffrey also stated that before the shooting, petitioner was armed with a .25 caliber handgun which was wrapped in a towel, and also had either a rifle or a shotgun, or both. *Id.* at 21-28. Jeffrey said the guns belonged to John Henry (petitioner's brother) and were brought to the scene by petitioner and Gary Henry (another of petitioner's brothers). *Id.* at 26-27. When asked why, with all that weaponry, they did not kill Turner at that time, Jeffrey responded, "They probably had Lee Brewer to do it." *Id.* at 29.

////

---

[18] Jeffery's wildly varying accounts of where he was, what he saw and did not see, and who actually did the shooting make it very difficult to take seriously anything he says about the event.

1    Following Johnson's shooting, Brewer came to Jeffrey's house to collect his fee. *Id.* at

2    30. Jeffrey said in his police interview that Jester, who was also present, told Brewer, "I don't

3    know. [Petitioner] set it up." *Id.* at 31. Jeffrey said that petitioner informed Brewer that he killed

4    the wrong man, but that he would take care of working out the payment. *Id.* at 30, 34-35.

5    At petitioner's trial, Jeffrey denied that he, petitioner, and Jester sold drugs. Henry RT at

6    322. He claimed that he was truthful in his statement to police detectives "most of the time." *Id.*

7    However, he denied telling the detectives in his interview that there was a plan to kill Turner.

8    When shown the transcript, Jeffrey claimed, "I don't remember that. I really don't. He probably

9    wrote it in there himself." *Id.* at 330. He stated he did not remember telling the officers that

10   petitioner had been armed with a gun. *Id.* at 333. The court took a recess in petitioner's trial and

11   ordered Jeffrey to listen to the recording of his police interview. *Id.* at 334. Jeffrey then admitted

12   that there in fact had been a meeting in which he, petitioner, and Jester reached an agreement to

13   shoot Turner. *Id.* at 338-39. However, he denied that petitioner was ever armed with a gun at the

14   scene and explained that he only had said that to the detectives because they were "harassing"

15   him and "hollering" at him. *Id.* at 340-41. Jeffrey testified that, when the fatal shots were fired,

16   he was standing on the sidewalk and that he saw Oden fire the shots out the driver's window. *Id.*

17   at 352. He testified that he was sure that Brewer did not do the shooting. *Id.* Jeffrey testified that

18   when Brewer came by the residence to collect payment the day after the murder, petitioner was

19   not present. He testified that he was mistaken when he told police that petitioner was present

20   because he had misidentified his cousin Alex for petitioner, his brother. *Id.* at 355-58.

21   In the Brewer trial, Jeffrey testified that in his statement to police, "I didn't tell them

22   nothing that was true, because he was – they was, you know, interrogating me. I didn't know

23   what to say you know. I just told 'em anything." Brewer RT at 263. He emphasized that

24   "everything" he told the police detectives was false. *Id.* at 263-64. Jeffrey testified that there was

25   no plan to shoot Turner. Instead, he said that the plan was to "beat [Turner] up." *Id.* at 269-70.

26   ////

18

Jeffrey told the court that he had made up the story about petitioner being armed at the scene of the shooting so that police would leave him alone.  *Id.* at 277.  Jeffrey testified for the first time in the *Brewer* trial that he was actually in the car when the shots were fired that killed Johnson.  He said he had lied before because he did not understand what "immunity" meant and that he was afraid to admit that he had been a passenger in the car.  Brewer RT at 297-98.

When asked if, after the shooting, Brewer and Oden had come by his cousin's residence, Jeffrey responded that they had, but he forgot why they did so.  When asked if they had come to get paid, Jeffrey answered, "Yes, I suppose so.  Yeah, he asked me."  *Id.* at 304.  Jeffrey admitted that he told the police that petitioner told Brewer that he had killed the wrong man but that was a lie.  Jeffrey said he lied to the police because they were "yelling," "cursing," and "they threw their guns on the table."  *Id.* at 310-11.  Jeffrey testified that although he had told the police that, when petitioner told Brewer he had killed the wrong man, Brewer had responded, "Oh well, he was talking a mile a minute," it had actually been Oden who made the statement.  *Id.* at 312-13.  Jeffrey further testified that he had told the police that Oden had done the shooting.  *Id.*

Jeffrey stated that when he told the police that petitioner had agreed he was going to handle the matter of payment and, because the wrong man had been killed, he was going to pay Brewer $100 (half of what they had agreed to), it was all a lie and the $100 figure was just made up.  *Id.* at 314-16.

Jeffrey also testified that before the shooting, he had told Brewer about petitioner being robbed by Turner.  *Id.* at 323.  Jeffrey admitted that Brewer was a friend of his and that he had not even known Oden, but said that he had told the officer that Brewer had done the shooting because "all that officer wanted to know was Brewer."  *Id.* at 326-28.

In the evidentiary hearing before the this court, Jeffrey initially testified that the passenger of the car did the shooting, but he no longer remembered "which one was in the passenger seat." EH Tr. at 173.  After petitioner refreshed Jeffrey's memory by showing him his declaration, Jeffrey testified that Oden did the shooting.  *Id.* at 175-176.

Jeffrey's testimony contained other miscellaneous inconsistencies.  In his police interview, Jeffrey stated that, after petitioner was robbed, they all walked to 315 Sawyer.  Jester's father let them in, and they discussed what happened.  Then petitioner left, but he did not know where petitioner went.  EH Tr., Ex. S at 18.  At petitioner's trial, Jeffrey testified that after petitioner informed him and Jester that he had been robbed, the three walked to 315 Sawyer and talked for a few minutes about how Turner should not have done what he did.  Then all three walked to 832 Stanford.  Henry RT at 327-28.  In the Brewer trial, Jeffrey testified that after petitioner was robbed, all three sat down in the area of Gateway and Rounds.  He testified that they then walked to 315 Sawyer when the sun "was coming up."  He said his aunt let them in. Brewer RT 267-68.

In his police interview, Jeffrey stated, "I don't sell dope."  *Id.* at 17.  In his testimony at the hearing, Jeffrey admitted that he, petitioner, and Jester were all selling crack cocaine.  EH Tr. at 106.

Petitioner argues that Jeffrey lied because he was intimidated by the detectives who interviewed him, was afraid to tell the truth because he did not know what immunity meant, was afraid that he would be prosecuted for being in the car with the shooter, and was afraid that Oden would harm him if he implicated Oden in the shooting.  Petitioner notes that Jeffrey was 16 at the time and was without a lawyer or parent during the interviews, was uneducated and incompetent, and the detective that was interviewing him had over 20 years' experience and was yelling and cursing at him.  Pet'r's Post-Evid. Hrg Br. at 11.[19]  Jeffrey also testified at Brewer's trial that the officers threw their guns on the desk during the interview.  *Id.*  Although Jeffrey may have been intimidated during the interview, as respondent points out, the jury at petitioner's trial heard the

---

[19]  Petitioner further alleges that Detective Bawart "has no problem with even falsifying police reports . . . which brings into question Detective Bawart's tactics and credibility."  Pet'r's Post-Evid. Hrg Br. at 11.  But Bawart's tactics are irrelevant except insofar as they relate to Jeffrey's credibility, and petitioner does not allege that Bawart falsified the recording of the interview with Jeffrey.

recording of the interview and were provided the transcript, yet still found petitioner guilty. Moreover, Jeffrey was not so intimidated that he agreed with everything that the detectives said. *See* Resp.'s Post-Evid. Hrg Br. at 8-9 (noting that Jeffrey repeatedly denied that he was given a gun or otherwise was armed at the scene; repeatedly denied that his cousin Jester was armed; denied John Henry was at the scene; and denied that he was present when Brewer was hired to carry out the murder, citing EH Tr., Ex. S at 23, 25-26, 29-30).

Jeffrey testified that he lied at petitioner's trial because he did not understand what it meant to be granted immunity. EH Tr. at 105. But Jeffrey was represented by counsel at the time he was granted immunity, and before he testified in petitioner's trial, the court told him that he was testifying under a grant of immunity, stating that, "if you testify in this matter, you cannot be prosecuted for anything about which you're questioned." Henry RT at 318. The prosecutor also told Jeffrey that he had personally dismissed a pending case against Jeffrey and that anything Jeffrey testified to would not be used against him. Jeffrey stated that he understood. *Id.* at 318-19. In Brewer's trial, Jeffrey asked the court, "Your Honor, am I – do I still have immunity? They gave me immunity when I was at my brother's trial." He was assured that he did. Brewer RT at 285-94.

Petitioner also contends that Jeffrey was afraid Oden would harm him if he testified that Oden was involved in the shooting. Pet.'s Post-Evid. Hrg Br. at 12. Petitioner contends that Jeffrey could come forward at the time of Brewer's trial because he knew Oden had left the state. *Id.* at 12. But petitioner does not explain why Jeffrey did not equally fear Brewer, who was rumored to have killed.

Moreover, Jeffrey's stories are not only internally inconsistent, but also conflict with the stories of various other witnesses. For example, Jeffrey testified that the car did not stop when the shots were fired, but kept moving. Brewer RT 299. In the evidentiary hearing, Alex contradicted that statement by testifying that the car did in fact stop when the shots were fired. EH Tr. at 157. Brewer also testified that the car was stopped, explaining that both he and Oden

1 were standing partially outside the car, each with one foot one the pavement at the time the

2 shooting occurred.  *Id.* at 45.

3      Also, Jeffrey testified at the evidentiary hearing that after the shooting, he helped wipe

4 down the stolen car and then went home to Stanford drive and stayed there all night.  *Id.* at 178.

5 When asked, he testified that he believed that he went back to Jester's house, but did not know

6 when.  *Id.*  Cherry Taggart testified that Jeffrey came to her home "not too long after" the

7 shooting.  *See* EH Tr. 338.  Petitioner argues it was Jester that was in Cherry's presence right after

8 the shooting, not Jeffrey.  Pet'r's Post-Hrg. Supp. Br. at 4.  However, Cherry stated that Jeffrey

9 did not arrive at the same time as Jester.  EH Tr. at 338.  Petitioner attempts to explain why

10 Cherry said that Jeffrey was at her home within 10-15 minutes after the shooting by arguing that

11 Jeffrey got dropped off about 3-4 blocks from Cherry's house after the shooting.[20]  *Id.* (citing Ex.

12 15 at 272).  But this is contrary to Jeffrey's testimony that he was at the Stanford drive house all

13 of that night.

14      Moreover, at the evidentiary hearing Jeffrey did not clearly testify that he actually saw

15 Oden shoot Johnson, and his memory of the shooting appeared to be unclear.  Jeffrey first

16 testified that he did not remember whether Oden or Brewer was in the passenger seat, but that the

17 person in the passenger seat did the shooting.  EH Tr. at 173.  After he was shown his prior

18 testimony in which he gave a different account, he claimed that he remembered that Oden had

19 been in the passenger seat.  *Id.* at 175.  He also did not "remember" until he read his previous

20 testimony whether Oden or Brewer had stated "let's turn around.  He's talking too much shit."  *Id.*

21 at 175-76.  Jeffrey testified that he did not remember which side of the back seat that he was

22 sitting in.  *Id.* at 316.  He stated that he "was like laying down, looking forward, through the

23 seats" when he heard the gun fired, and that he could see because the car had bucket seats.  When

24 he was then asked whether he laid down before or after the shots were fired, he stated that he was

25

26      [20] Petitioner notes that this is consistent with Brewer's testimony that he dropped Jeffrey off on the corner of Sage and Griffin after the shooting.  *See* EH Tr. 53.

1  not sure.  Then he stated that he laid down before the shots were fired because he saw Oden

2  "bringing up the gun . . . he was going to shoot it." *Id.* at 316-318.  Jeffrey had previously

3  testified at Brewer's trial that "when I seen Oden pick up the gun, I . . . asked him what was he

4  doing, and he said, 'I finish shoot him because he was talking too much, he's talking too much, he

5  deserve it.'"  Henry RT 336-37.  Jeffrey testified that "[a]fter the shots were fired and after I seen

6  Andre hit the ground, I put my head down."  *Id.* at 338.

7       Not only was Jeffrey's varying accounts wildly inconsistent, and his memory repeatedly

8  unreliable, his demeanor at the evidentiary hearing was not at all convincing.  He repeatedly

9  stated that he did not remember various details of the shooting, only to claim that he remembered

10  them once he had reviewed his previous testimony in which he gave varying accounts.  It was

11  apparent that what he struggled to remember was what he previously had said in prior testimony.

12  The more probable explanation for Jeffrey's inability to recall who fired the gun is the account

13  that he first told the police; he was not in the car at the time and did not see who did the shooting.

14  Also, as petitioner's brother, Jeffrey clearly has a motive for fabrication.  The court finds that

15  Jeffrey is not a credible witness.

16              b.    Francis Brewer's testimony

17       Petitioner also contends that Brewer's statements to respondent's counsel in a March 10,

18  2009 interview and Brewer's testimony at the evidentiary hearing that Oden was the shooter

19  support petitioner's claim of actual innocence.  EH Tr. at 42.  Petitioner further contends that

20  Brewer's testimony at the evidentiary hearing that he picked up Jeffrey at Gateway Drive and

21  Sawyer Street and that Jeffrey was in the back seat of the car at the time of Johnson's shooting

22  bolsters Jeffrey's credibility, as Jeffrey testified that after Johnson pulled out his gun, he started to

23  head home and asked Oden and Brewer for a ride.  EH Tr. at 34, 172.  However, as with Jeffrey's

24  credibility, there are significant issues surrounding Brewer's credibility.

25       First, Brewer's testimony contains some internal inconsistency.  In Brewer's first

26  interview with the police in 1985, he denied any involvement, claiming that he did not know

Jeffrey, but that he looked like someone who sold "fake dope," and did not leave his house on Thanksgiving day or night.  EH Tr., Ex.12 at 3, 9-10.  He stated that he did not know Oden well, and said that despite having Oden's number in his wallet twice, he had never called him.  *Id.* at 14-16.  He denied petitioner ever offered him anything to do anything, and denied owning a rifle. *Id.* at 16.

Brewer was interviewed by respondents' counsel on March 10, 2009.  He said that he knew petitioner and Jeffrey; that he owned a sawed-off rifle; and that he had a car that he'd gotten from Oden.  EH Tr., Ex. P at 1-3.  He said that Oden woke him up between 8 and 9 p.m. on Thanksgiving evening and told him that Alex had been shot,[21] and that he took his rifle with him and he and Oden drove to the area of Gateway and Rounds streets; there, he claimed he saw either Jeffrey or Jester and picked one of them up, but he was not sure which one.  *Id.* at 3-4 .  He said that he stopped the car to look for Alex's body, and was halfway out of the car with his foot on the brake when Oden took the gun from under the driver's seat, stepped partially out of the car, and fired shots.[22]  *Id.* at 5-6 .  Brewer stated he did not say anything when Oden grabbed his rifle or when Oden began firing, but afterwards asked Oden, "why did [you] shoot the person?"  Brewer claimed Oden never provided an audible response, and Brewer did not pursue it further EH Tr. at 9.  At the evidentiary hearing, Brewer testified that even though he had always confused Jester and Jeffrey's names, he thought long and hard about it after the interview and it was in fact

---

[21] Jeffrey testified that he did not recall any rumors that Alex had been shot.  EH Tr. at 271.  Although this does not mean that Brewer is lying about the rumor–after all, Brewer may have heard a rumor that Jeffrey did not–Jeffrey's testimony does not bolster Brewer's credibility.

[22] Petitioner says this bolsters Jeffrey's credibility because Jeffrey said that he saw Oden grab the gun and Brewer said he saw Oden with the gun when he sat back down in his car.  Pet'r's Post-Hrg. Supp. Br., Dckt. No. 188 at 5.  Since both witnesses testified that Oden fired the gun, this consistency does not add much credibility to their stories.

Petitioner also says Brewer's testimony that Oden was partially outside the car door when he started shooting at Johnson and that Brewer was also partially outside his own door at the time, EH Tr. at 35-38, is also bolstered by Gardner's testimony that "they were hanging out the window" and "I could see someone hanging out the window" when the car drove by, EH Tr. at 91-92.  Again, this tenuous similarity in testimony does not do much to bolster Brewer's credibility.

1   Jeffrey, not Jester, who was riding with him when the shooting occurred.  EH Tr. at 50-51 .

2        The inconsistencies between Brewer's initial interview with the police and his later

3   testimony are relatively easy to understand.  Brewer had reason to lie during his initial interview,

4   as he was trying to avoid incriminating himself.  After he had been tried and convicted for

5   Johnson's death, there was little reason for him to continue to deny his involvement.

6        However, Brewer's testimony is inconsistent with petitioner's.  Brewer testified that he

7   did not know that petitioner had been ripped off by the intended victim, and that he was not

8   offered drugs to beat up or kill anyone.  *Id.* at 13.  Also, Brewer testified that he and petitioner

9   were cellmates at Folsom prison and that petitioner had told him that he had lied to the police and

10  told them that he hired Brewer because that was what the police wanted to hear.  *Id.* at 18-19.

11  This is contrary to petitioner's claim that he offered Brewer two rocks of cocaine to beat up

12  Cedric Turner.  Am. Pet. at 2.

13       There are several other major reasons why Brewer's testimony is not credible.  Obviously,

14  he has a motive to testify that Oden was the shooter, that is, to take the blame off of himself.

15  Finally, Brewer was impeached by evidence that in addition to the indeterminate life sentence he

16  is serving in this case, he has prior felony convictions for assault with great bodily injury, escape,

17  and a forcible sex offense.  EH Tr. at 49-50.  The court finds that Brewer's testimony was not

18  credible.

19              c.    Charles Austin's testimony

20       Petitioner also contends that Austin's testimony at Brewer's trial supports his actual

21  innocence claim.[23]  At Brewer's trial, Austin testified that the passenger in the car was the shooter

22  Brewer RT 651-52.  Austin testified that he saw Brewer driving with his hands on the steering

23  wheel *when the shots were fired*, and that Brewer was "looking funny" "like he [was] shocked."

24

25       [23]  As noted above, Austin did not testify at the evidentiary hearing because he could not
    be located, despite multiple unsuccessful attempts to serve him.  The court admitted Austin's
26  prior testimony at the Brewer trial by the parties' stipulation.

Brewer RT 652.  Austin also stated there may have been three people in the car, because "I thought I seen the head pop up, but I wasn't too sure."  *Id.* at 650.  However, there are problems with Austin's credibility as well.

First, his testimony contains inconsistencies with that of other witnesses.  For example, Jeffrey testified in the Brewer trial that Brewer's vehicle did not stop, but instead, kept moving when the fatal shots were fired.  *Id.* at 299.  In contrast, Austin testified at the same trial that the car came to a complete stop when the shots were fired.  *Id.* at 656.  In addition, Jeffrey testified he, Jester, and petitioner all were carrying sticks before the shooting, while Austin testified that the only person that he saw with a stick was petitioner.  *Id.* at 645, 663, 679.

Second, and more fundamentally, Austin's story is implausible.  Austin testified that the driver's side of the car was toward him and he was looking in the driver's window, but also saw the barrel of a rifle protruding out of the passenger window.  Brewer RT at 649, 651.  Austin further testified that he could see that Brewer's hands were on the steering wheel at the time of the shooting.  *Id.* at 652.  The shooting occurred at approximately 7:30 p.m. in late November (i.e. November 30).  Henry RT at 124.  There was testimony it was "night."  EH Tr. at 108.  Unless the light in the car was on, it is improbable that Austin could have seen Brewer's hands on the wheel and the expression on his face from where he stood on the sidewalk.

Third, Austin's credibility is suspect because he appears to be a friend of Brewer's.  Austin met Brewer when they were in jail; they were in the same jail for two and a half months.  Brewer RT at 639-40.  After Austin was released from jail, he visited Brewer once and spoke with him on the phone once.  Brewer RT at 642-43.  While Brewer was still in custody, Brewer sent a letter to Austin's wife.  *Id.* at 643.  At the evidentiary hearing, petitioner argued that "[i]t's just unfortunate that all the individuals involved here have been in jail one time or another in this–how our jail was not this, that big, we're going to run into each other.  And I just hope that this Court don't assume based on that that his credibility is zero."  EH Tr. at 383.  But Brewer and Austin's appeared to have a relationship with one another beyond simply being incarcerated in

the same location; they appear to be friends.[24]

Given Austin's bias and the generic nature of his testimony, and the other credibility issues noted above, the court finds that Austin's testimony is not credible.

### d.   Other evidence

Petitioner also contends that other miscellaneous evidence supports his claim that Oden was the shooter.  Each piece of evidence will be addressed in turn.

First, petitioner claims that Alex Taggart testified that Oden was the shooter.  *See* Pet'r's Supp. Br. at 6 (citing EH Tr. at 146-47).  Alex actually first testified that he did not remember seeing the passenger do the shooting.  EH Tr. at 145.  When shown that he had previously testified that he had seen the passenger shoot, he said that it must be true.  *Id.* at 146.  Alex later testified that he could not see where the shots came from, and that he did not see who was in the car, although he "heard and seen the direction and...seen some sparks from that area, from the car."  *Id.* at 156.  Alex's testimony is unclear and does not add much support to petitioner's version of the facts.

Second, petitioner claims that Oden's initial statements to police that Jeffrey was in the car bolster Jeffrey's credibility, and therefore add credence to Jeffrey's testimony that Oden was the shooter.  Oden told the police that he and Brewer picked up Jeff Taggart and that Jeff sat in the front passenger seat.  EH Tr. at 13-14.  He stated that they stopped the car, then they got out and a few minutes later Brewer fired shots from the passenger window.  *Id.* at 15-16.  He stated that he was on the opposite side of the street when this happened and that the shots were

---

[24] Respondents argue that Austin's testimony is further discredited by "the fact that he claimed to have known for two years that Oden, not Brewer, was the shooter yet, despite being prosecuted himself for robbery of a Taco Bell during that period, he never bothered to provide this information to the police . . . [and] he had not come forwards with his story during petitioner's trial because, although he had known petitioner and his family since 9th grade, he felt 'it's none of my business.'"  Resp.'s Post-Evid. Hrg Br. at 19.  It might reflect badly on Austin's credibility if he had actually "come forward" with his story for Brewer and not for petitioner.  But Austin testified that he never actually "came forward" with his story.  Austin said that when he found out what Brewer was in jail for, he told Brewer what he had seen, and Brewer "didn't say much about it" but had his attorney contact Austin.  Brewer RT at 641-42.

"definitely" coming from the passenger window. *Id.* at 16. He stated that he was sure that
Brewer had fired the shots, even though Jeff was the one in the passenger seat, because Brewer
was the one that had been hired to shoot. *Id.* at 17. He stated that Brewer dropped him off at
home after the shooting. When asked how he got back in the car after the shooting he said that
Brewer picked him up down the street a block away. When asked if there was a plan to be picked
up, Oden stated that he had told Brewer that he would be down the street when he got out of the
car. *Id.* at 20.

At Brewer's trial, Oden testified that Jeffrey was not in the car before the shooting.
Brewer RT at 406. When confronted with his prior statements, Oden explained that he had told
the detective that Jeffrey was in the car before the shooting because "I got confused." *Id.* at 409.
When asked, "you told us this morning that Jeffrey was never in the car until after the shooting
occurred; didn't you say that," Oden stated that he had "a lot going on right now . . . so I can't
remember everything, details," and then admitted that he could not remember if it was true or not.
*Id.* at 414. Later in the day Oden stated that "at one point in time [Jeffrey] was in the vehicle."
*Id.* at 421.

An investigator interviewed Oden in 1986. EH Tr., Ex. 13. At that time Oden stated that
he was in fact in the car when the shooting happened, and that Jeffrey was not, even though they
had picked him up 20 minutes before. *Id.*

Oden's testimony is internally inconsistent, he admitted to having a poor memory of the
events and he did not present as a credible witness. While Oden's original statements to the
police are indeed consistent with what he might be expected to say if he was the shooter and was
attempting to conform his story to that of other witnesses while not incriminating himself–that is,
that Jeffrey was there, the shots came from the passenger side of the car, and Oden himself was
outside of the car and was picked up later a block away–his inconsistent and incredible testimony

////

////

1   does not add reliable support to petitioner's version of the facts.[25]

2        Third, petitioner argues that Gardner's testimony at the hearing that four people were in

3   the car at the time of the shooting supports Jeffrey's credibility.  But Gardner did not actually

4   remember how many people were in the car.  She stated that "it was a lot of children in there,"

5   that "I couldn't even remember the faces who was hanging out the windows," that she could not

6   remember whether there were more than two people in the car, that "I think there was someone in

7   the backseat, someone in the front seat . . . I'm trying to get in my mind a picture of the car, and I

8   cannot."  EH Tr. at 91-93.  Gardner did not clearly testify that there were three people in the car.

9   Moreover, even if there were three people in the car, it would not mean that Jeffrey was the third

10  person.  More importantly, even if Jeffrey was in the car, it would not mean that Oden was the

11  shooter.  His presence in the car does little to answer for the many other conflicting accounts that

12  were provided by Jeffrey and hardly rehabilitates his credibility and reliability as a witness.

13  Indeed, even under Jeffrey's most recent account (the one he described at the evidentiary

14  hearing), he was lying down in the back seat, a position that would not likely have afforded him a

15  vantage point where he was able to observe who shot the gun.

16       Fourth, petitioner argues that Detective Bawart had information that Oden was the

17  shooter, but chose to "brush it off."  Pet'r's Post-Evid. Hrg Br. at 13.  Bawart testified at Brewer's

18  trial that "we had been told that it was a possibility that Oden was the shooter," and that although

19  "[t]here was nobody that could come up and tell us yes, I have that information, it was rumors

20  that were coming from Country Club Crest, anonymous phone calls, that type of activity."

21  Brewer RT at 612.  Although Bawart's testimony that he heard rumors that Oden was the shooter

22  does support petitioner's theory that Oden was indeed the shooter, the court does not afford much

23

24       [25]  The court notes that Oden was a key witness against petitioner at his trial.  Thus, Oden's lack of credibility does tend to undermine some of the evidence presented against petitioner at his trial.  But this is not a retrial where the prosecution has the burden of proving

25  petitioner's guilt beyond a reasonable doubt.  Rather, this proceeding is limited to the question of whether petitioner has carried his burden of affirmatively proving his actual innocence.  Oden's

26  lack of credibility does not aid petitioner in carrying this burden.

1    weight to this vague hearsay evidence.

2        Fifth, petitioner contends that Oden had a motive to shoot Johnson.  Pet'r's Post-Evid. Hrg

3    Br. at 14.  He contends that there was a confrontation between Oden and Brewer and Johnson and

4    Oden was aware that Johnson had a gun.  *See* EH Tr. at 172, 177, 317-18 (Jeffrey's testimony that

5    he got into Brewer's car after Johnson pulled out a firearm, that Oden said as they were driving

6    away that they should turn around because Johnson was "talking too much shit"); Henry RT at

7    174 (Oden's testimony that Johnson had an argument with "a few other people" and "sounded

8    like he was pretty upset" and yelled "Furthermore, fuck all of ya"); Henry RT at 113 (Turner's

9    testimony that Johnson yelled, "Go ahead, I can take one" right before he was shot); EH Tr., Ex.

10   S at 36 (Jeffrey's statement that Johnson was waving around a gun); EH Tr., Ex. P at 15

11   (Brewer's statement to police that he heard Johnson had a gun and "[h]e lifted his shirt up and

12   they seen it and somebody pulled it out and held it straight in the air and that's why– That's when

13   he got shot and I don't know"); EH Tr., Ex. 16 (Oden's statement that Johnson kept messing with

14   his waist, although Oden didn't see a gun); EH Tr. at 90 (Gardner's statements at hearing that an

15   unknown man in a suit asked her if she had picked up a gun from Johnson's body after the

16   shooting); Henry RT at 211 (Alex's testimony at Brewer's trial that Johnson had a gun at the time

17   he was shot).  But evidence that Johnson had a gun and was being confrontational towards Oden

18   and Brewer before he was shot does not imply that Oden, rather than Brewer, shot him.

19        Sixth, petitioner contends that the evidence shows that Johnson was the intended target of

20   the shooter, and that Brewer did not misidentify Johnson as Turner, as the prosecution theorized

21   at petitioner's trial.  Pet'r's Post-Evid. Hrg Br. at 15.  A criminologist at petitioner's trial testified

22   that Johnson, not Turner, was clearly the intended target of the shooting.  Henry RT at 431.  The

23   criminologist also testified that at least one of the shots could not have come from the window of

24   the car.  *Id.*  Petitioner argues that this testimony is consistent with Brewer's testimony at the

25   hearing that Oden had the car door open and was partially standing outside the door during the

26   shooting.  EH Tr. at 15.  Petitioner argues that this is also consistent with Gardner's testimony at

30

1   the hearing that someone was hanging outside the car door's window, as Gardner may have

2   mistaken Oden standing outside the door as someone hanging outside the window.[26]  This

3   evidence does lend some support to petitioner's version of the facts.  But the jury at petitioner's

4   trial convicted him despite hearing the criminologist's testimony.

5       Petitioner argues that, contrary to the prosecution's theory at his trial, he was not at the

6   Taggarts' home after the shooting to discuss payment with Brewer.  Pet'r's Post-Evid. Hrg Br. at

7   17.  He argues that because he fled after the shooting, he could not have had any discussions with

8   Brewer or Oden at any time after the shooting, and therefore it could not be inferred that

9   Johnson's death was a murder-for-hire gone bad.  *Id.* at 18.  Brewer testified at the hearing that

10  the day after the shooting, he went to the Taggarts' home, but petitioner was not there.  EH Tr. at

11  43-45.  The only person that Brewer saw at the house was Alex, although he was not sure if there

12  were other people "in the bedroom, or whatever."  *Id.* at 45.  Petitioner's claim that he was not at

13  the Taggarts' house on the day after Thanksgiving is corroborated by Oden in his police interview

14  and his interview with Hicks, as well as his trial testimony in the Brewer trial.  EH Tr., Ex. 16 at

15  18-21, Ex. 13 at 2; Brewer RT at 532 (testifying that petitioner was not at the house, and that he

16  had previously meant to testify only that petitioner was at an earlier meeting); Alex's testimony at

17  the evidentiary hearing, EH Tr. at 144; Cherry's testimony at the evidentiary hearing, EH Tr. at

18  346; and Jeffrey's testimony at the evidentiary hearing, EH Tr. at 184.  However, Jeffrey stated in

19  his initial police interview that Robert was at the house when Brewer and Oden came over.  EH

20  Tr., Ex. S at 33-34.  Petitioner argues that Alex, Cherry, and Brewer were unimpeached

21  witnesses, and therefore their testimony should be credited.  Pet'r's Post-Evid. Hrg Br. at 18.  But

22  whether the post-shooting discussion between petitioner and Brewer occurred is not decisive of

23

24  [26]  Petitioner argues that the state's theory was that Brewer mistakenly shot Johnson
    thinking that he was Turner, but that Brewer testified at the hearing that he knew who Johnson
    was and Oden testified that Brewer knew Turner.  Pet'r's Post-Evid. Hrg Br. at 16-17.

25  Therefore, petitioner implies, even if Brewer shot Johnson, he did so for his own reasons
    unrelated to petitioner's quarrel with Turner, and petitioner is innocent.  As discussed above, the

26  court does not find Brewer's or Oden's testimony credible.

whether petitioner hired Brewer to harm Turner.  In order for petitioner to meet his burden of proof on his free-standing innocence claim, he must establish that Brewer was not the shooter. Petitioner has not done so.

Petitioner argues that he did not have the opportunity to prepare his witnesses before the evidentiary hearing.  Petitioner stated that he had not seen his family members in 15 years, and that they came to the evidentiary hearing unprepared and not having reviewed prior transcripts. EH Tr. at 412.  Therefore, petitioner argues, the court should not expect them "to be a hundred percent on point"; indeed, he argues, "if they was on point on everything, I would believe that their testimony was coerced or . . . made up."  *Id.*  The court does not expect witnesses to have complete recall all of the details of events that happened 25 years ago.  However, as described above, the witnesses' lack of credibility stems from conflicts and internal inconsistencies on the crucial details.

Finally, petitioner argues that respondents did not produce rebuttal evidence at the evidentiary hearing.  Pet'r's Post-Evid. Hrg Br. at 19.  As discussed above, petitioner has the burden of proving his actual innocence claim; accordingly, respondents are not required to introduce any evidence.

The court has also considered the testimony of Pamela Conyers at Brewer's trial.  Conyers lived with her mother and Oden.  According to Conyers' testimony, she had told an investigator of a statement Oden had made to her.  She testified that Oden had told her that he had done the shooting because "the man had cussed at him."  Brewer RT 632-38.  Her testimony at the Brewer trial was that she had made up the story because she was angry at Oden for bringing other women around when he was dating her mother.  *Id.* at 637.  She also testified that shortly after Thanksgiving Oden asked her to store a gun in her storage, and she said no.  *Id.* at 633.  Although Conyers' statement to the investigator is certainly favorable to petitioner, she recanted this statement when under oath.  Thus, one can argue doubt as to which version is true, the doubt as to her credibility does little to support petitioner's version of the facts and certainly does not

1  affirmatively prove his innocence.

2       Taking into account all of the evidence petitioner has submitted, the court finds that

3  petitioner has failed to meet his burden of proving that he is probably actually innocent.

4       2.    <u>Evidence to support theory that Brewer was shooter</u>

5       The record contains ample evidence suggesting that, contrary to petitioner's actual

6  innocence claims, Brewer, and not Oden, was the shooter.

7       a.    <u>Oden's testimony</u>

8       Oden testified at Brewer's trial that Brewer shot Johnson.  Brewer RT at 384-85.

9  Petitioner contends that Oden had a very strong motive to lie because he was the actual shooter.

10  Pet'r's Post-Evid. Hrg Br. at 11.  Petitioner also contends that Oden's testimony is not credible

11  because he committed perjury in petitioner's trial by stating that Jeffrey was in the backseat after

12  the shooting and helped wipe down the car, then testified at Jester's trial that it was Jester in the

13  backseat, then testified again in Brewer's trial that it was Jeffrey.  *Id.*

14       Petitioner also contends Oden's guilt is shown by the fact that he left the state before

15  Brewer's trial, apparently believing that Brewer would testify that Oden was the shooter.  *Id.* at

16  12.  T.J. Hicks testified that when he went to Oklahoma to interview Oden in the Tulsa County

17  Jail in 1987, Oden told him that the only reason that he would go to California would be "the

18  opportunity to escape."  Doc 158, Ex. 2.  Hicks testified that Oden said that the only reason that

19  he had testified in petitioner's, Brewer's and Jester's trials was so that he wouldn't be prosecuted

20  himself.  *Id.*  As the court has noted above, Oden's testimony does not appear to be credible,

21  although it provides some support for respondent's theory that Brewer shot Johnson.

22       b.    <u>Petitioner's own statements</u>

23       Petitioner made several incriminating statements during and after his police interview.

24  During his police interview, petitioner admitted that he had offered Brewer payment to harm

25  Turner.  Remarkably, the following exchange occurred between petitioner and the police:

26  ////

Detective Bawart: "OK.  You told Lee about the problem you were having with Ced?"

Petitioner: "Yep."

Detective Bawart: "You offered Lee $200 to shoot Ced, right?"

Petitioner: "No."

Detective Bawart: "Now that's a lie, son."

Petitioner: "I didn't offer him $200."

Detective Bawart: "How much did you offer him?"

Petitioner: "I offered him $50, well, it was really, it wasn't that, it was just cocaine and he [wasn't] gonna do it."[27]

Detective Bawart: "Ok.  Ok.  So you were going to give him cocaine if he'd shoot Ced?  Ok?"

Petitioner: "Yeah."

Detective Bawart: "Did you intend for him to kill Ced?"

Petitioner: "No.  I didn't even intend for him to shoot him.  I just intended for him to scare him.  Hold him while we can beat him.  You know.  We wasn't gonna, you know, shoot, not me, I know that."

EH Tr. at 20-21.

However, later in his police interview, petitioner did not renew his objections to the detective's statements that he had hired Brewer to shoot Turner:[28]

Detective Bawart: "OK.  And so the next time you saw Lee, after you offered him these two rocks to shoot Ced, he was in his car with this other dude.  When you first saw him, was this other dude with him?"

Petitioner: "Nnnnope."

Detective Bawart: "No?  OK.  How long between the time you told him you'd give him two rocks to shoot Ced and the guy came back with the car?  How long was that?  A matter of minutes?"

Petitioner: "About 15 minutes."

---

[27] The transcript of the interview reads "and he was gonna do it."  Petitioner argues that the transcription is incorrect and he actually said "and he wasn't gonna do it."  EH Tr. at 422.  The court has reviewed the recording of the interview and agrees that petitioner said "wasn't."

[28] Respondents contend that the following exchange from the transcript of the interview also constitutes an admission by petitioner that he hired Brewer to shoot Turner:

Detective Bawart: "Ok.  Did you tell Brewer you wanted him to shoot Cedric when he was on foot or when he was in the car?"

Petitioner: "I told him on foot.  I didn't tell him, you know, on . . . ."

*Id.* at 28.  Petitioner argues that the transcription is incorrect and he actually said "I didn't tell him, you know, to shoot."  EH Tr. at 423.  The court has reviewed the recording of the interview and agrees with petitioner.  Accordingly, the exchange shows a revenge motive and some sort of solicitation of Brewer to assist in carrying out the revenge but does not constitute an actual admission that petitioner hired Brewer to shoot Turner.

34

1     *Id.* at 29.

2        Petitioner contends that his answer, "[n]ope," was only in response to the detective's last

3 question; that is, whether Brewer was with "this other dude" when petitioner first saw him. EH

4 Tr. at 425. Similarly, petitioner contends that his statement "[a]bout 15 minutes" meant that

5 about 15 minutes elapsed between when he offered Brewer two rocks of cocaine and when he saw

6 him again. *Id.*

7        Dectective Bawart testified that after the recording had been switched off and he asked

8 petitioner to step into a detention cell, petitioner admitted that he had hired Brewer to kill

9 Turner.[29] Detectives Becker and Bawart both testified that petitioner made this statement. Henry

10 RT at 402 (Becker's testimony that "[h]e stated he couldn't understand why he was going to jail

11 for murder, because the guy that he had hired had shot the wrong person"), 405 (Bawart's

12 testimony that petitioner said "I hired Lee Brewer to kill Cedric Turner. He killed the wrong guy.

13 I can't understand why I am being charged," and that this statement was "very much" his exact

14 words, "verbatim."). Bawart's police report actually states that petitioner "made the statement

15 which is *similar to* 'I hired Lee Brewer to kill Cedric Turner, and he killed the wrong guy. I can't

16 understand why I am being charged.'" Am. Pet., Ex. J (emphasis added). Petitioner argues that

17 the detectives misheard his statement, and that he actually said "*If* I *had* hired Francis Brewer to

18 kill Cedric Turner, and he got the wrong guy, I don't know why I am being charged." Am. Pet.,

19 Ex. B. Petitioner notes that Bawart has a hearing problem, and that he himself is soft-spoken.

20 Dckt. No. 157 at 12 (citing Henry RT at 512 (prosecutor's closing argument stating that

21 "especially Detective Bawart, because he does have a hearing problem, makes a real attempt to

22 make sure he understands and hears what, in fact, the person said")). Nevertheless, Bawart's

23 testimony gives support to respondents' theory of the case.

24 _____

25     [29] Petitioner contends that as he was not given the opportunity to cross-examine Bawart regarding this statement at his evidentiary hearing, the court should not consider his testimony. Dckt. No. 191 at 22. However, the parties stipulated to the admissibility of petitioner's trial

26 transcripts, including Bawart's testimony.

1    Petitioner has also made some inconsistent statements.  In petitioner's statement to police,

2  he stated that before the robbery, he was selling powder cocaine near Gateway and Rounds.  EH

3  Tr., Ex. G at 4.  In his deposition, petitioner said that he was selling rock cocaine, and that "[i]f I

4  said powder before, maybe because I was under educated as to the difference at the time.  I had

5  just started selling drugs at the time I was robbed."  EH Tr., Ex. N at 8.  In his police statement,

6  petitioner claimed he was robbed of $200 and $80 worth of cocaine.  EH Tr., Ex. G at 9.  But in

7  his deposition, petitioner claimed it was $200 worth of cocaine and $30 or $50 in cash.  EH Tr.,

8  Ex. N at 12.  Petitioner initially told Vallejo police that he did not have any firearms at all.  EH

9  Tr., Ex. G at 14.  Later in the interview, petitioner changed his story and claimed he only had an

10  inoperable long gun.  *Id.* at 16-17.  He claimed that Jeffrey was lying about him being armed with

11  a handgun.  *Id.* at 18.

12    More significantly, petitioner stated in his amended federal habeas application that, "I

13  offered Francis Brewer two rocks of cocaine, worth about $50.00, if he would help us give Cedric

14  Turner an ass-whipping."  Am. Pet. at 2.  Brewer denied at the evidentiary hearing that petitioner

15  offered him money to hurt Turner.  EH Tr. at 31, 57.  Petitioner then testified that "I would have

16  to say that I didn't offer him" coke to help assault Turner, "because the whole thing was tooken

17  out of context."  *Id.* at 235-36.  Petitioner explained in his post-hearing brief that he did offer

18  Brewer "two rocks of cocain[e] to 'help' [him] whip Turner's ass," but that the offer was just

19  something he threw up "in the air, as part of a general discussion."  Pet'r's Post Hrg. Brief at 5.

20  Petitioner contends that he was not serious, that Brewer did not use drugs back then, and that

21  Brewer did not agree or accept such an offer.  *Id.*  Petitioner explains the inconsistency between

22  his testimony and Brewer's by arguing that he only asked Brewer to "help" beat up Turner, and

23  that he never asked Brewer to personally beat up or kill Turner.  *Id.* at 20-21.  While some of

24  these inconsistencies are relatively minor, compared with the inconsistencies of most of the other

25  witnesses in the case, they do undercut the credibility of his testimony, particularly as he

26  attempted to explain away the highly incriminating statements he initially made to the police that

1   he hired Brewer, for two rocks of cocaine, "to kill Cedric Turner, and he got the wrong guy, I

2   don't know why I am being charged."

3                    c.       Additional evidence of petitioner's guilt

4           Turner testified at petitioner's trial that the first time he saw petitioner, who was with

5   Jester, in the early evening of Thanksgiving Day, he told petitioner that he wanted to talk with

6   him.  Petitioner and Jester repeatedly told Turner "you're gonna die."  Henry RT at 41, 45.

7   Turner further testified that several minutes before the shooting, Jester told the crowd that had

8   gathered outside Johnson's house to move because "Somebody's going to get shot."  Id. at 48-49.

9   Immediately before the shooting, Turner heard someone yell, "Watch out, he's gonna shoot."

10  Turner testified that he did not see who said that but "it sounded like Jester' voice."  Id. at 59.

11  Turner later testified that Jester had actually yelled, "get back, get back," and had not said that

12  there would be a shooting.  Id. at 95.[30]

13          Another piece of evidence of petitioner's guilt is that petitioner had his brother drive him

14  to Richmond and stayed at a hotel on the night of the shooting.  If petitioner was not involved in

15  the shooting, he would not have felt the need to flee.  The fact that he did manifests consciousness

16  of guilt.  Petitioner explains his behavior by stating that he thought that he might have been the

17  intended victim of the shooting, since he and his family were feuding with another family in the

18  neighborhood.  Am. Pet. at 4.  Petitioner further explains that he called his sister Debrah from the

19  hotel, and she told him that the police were looking for him in connection with the shooting.  Id.

20  Petitioner states that he went to the police station the next day because he "didn't do anything"

21  and wanted "to straighten it out."  Id.  Nonetheless, his flight on the night of the shooting and

22  before he spoke with his sister lends support to respondent's theory.

23          In light of the evidence of his guilt that resulted in his conviction, and the lack of

24  credibility of the witnesses he now relies to attempt to try to show Brewer was not the shooter,

25  _____

26          [30] Turner later agreed with counsel's statement that Jester had said "watch out, watch
    out."  Henry RT at 101.

1    petitioner has not met his burden of proving that he is actually innocent on the theory that Oden

2    was the shooter, and not the man petitioner had hired, Brewer.  Under *Carriger*, petitioner has

3    fallen far short of his burden of affirmatively proving his actual innocence.[31]

4    B.    Petitioner's theory that he is innocent because he did not hire Brewer to kill Turner

5          Petitioner also argued at the evidentiary hearing that he is innocent because he did not hire

6    Brewer to kill Turner, only to beat him up.  This claim is similar to his defense at trial, to his

7    claim before Judge Singleton, and to his third claim on appeal to the Ninth Circuit regarding

8    insufficiency of the evidence.  Petitioner wrote in his opening brief to the Ninth Circuit:

> At Mr. Henry's trial, the only percipient witness who testified
> regarding the conversation that occurred between Robert and
> Francis Brewer prior to the shooting, Bernard Oden, indicated that
> Mr. Henry offered Francis Brewer two rocks of cocaine to give
> Cedric Turner a beating. RT 160.  No one testified that Robert
> Henry offered Francis Brewer two rocks of cocaine to kill Cedric
> Turner.  Thus, even without the evidence that later emerged -- that
> Bernard Oden and not Francis Brewer was the shooter -- there was
> insufficient evidence to prove that Robert intended for Brewer (or
> anyone else) to kill Turner (or anyone else).
>
> Moreover, assuming for the sake of argument the truth of Oden's
> impeached testimony and Jeff's impeached statement that Robert
> was present the following date and engaged in a conversation with
> Brewer to the effect that Brewer "killed the wrong man," such an
> after-the-fact statement cannot prove that Robert intended for
> Francis Brewer to kill Cedric Turner at the time Andre Johnson was
> shot.
>
> There was ample evidence from the only percipient witness who
> testified, Bernard Oden, that Brewer had an independent reason to
> shoot Johnson.  Oden testified that Robert approached him and
> Brewer out on Gateway when Cedric Turner was already in
> Johnson's car, and pointed out Cedric to Brewer in unequivocal

---

[31]   In *Carriger*, the Ninth Circuit found that Carriger had not proven that he was actually
innocent where the prosecution's star witness confessed in open court, without being granted
immunity, that he, and not Carriger, had committed the crime, and there was little other evidence
of the petitioner's guilt.  132 F.3d at 477.  The Ninth Circuit stated that the witness' confession
to the crime only "served to undercut the evidence presented at trial" and that because the
witness later recanted his story, his confession only constituted "some evidence" in Carriger's
favor. *Id.*  The Ninth Circuit implied that Carriger had not met his burden of affirmatively
proving his actual innocence because he had not provided evidence as convincing as alibi or
DNA evidence. *Id.*

terms as being the intended recipient of the "ass-whipping."  RT 146-47; 167-72.  Oden also testified that Johnson was upset and belligerent, making general insulting remarks.  RT 174; 186-88. Oden further testified that he and Brewer drove away, returned, slowed nearly to a stop, and Brewer took out his gun and began firing directly at Andre Johnson.  RT 194-95.  There was no indication based on this testimony that Brewer was attempting to shoot Cedric Turner, and missed and hit Andre Johnson instead, or that Brewer mistook Andre Johnson for the intended recipient of the "ass-whipping."

In sum, based on the evidence actually presented at Mr. Henry's trial, there was simply no proof that, before the shooting, Robert Henry hired Francis Brewer intending to use Brewer as his agent to shoot Cedric Turner, nor was there any proof that the person seated in Johnson's car, and not Johnson, was the person Robert wanted "whipped."  In other words, there was no evidence that Robert intended to have Turner killed by Brewer or that, in killing Johnson, Brewer was under the misapprehension that Johnson was Turner. There was neither evidence of intent or of transferred intent. Accordingly, no rational factfinder could have found based on the evidence presented, even when construed in the light most favorable to the prosecution, each essential element of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979).

Appellant's Opening Br., 2005 WL 4838037.  Judge Singleton denied this claim, writing, "Henry argues that while there was substantial evidence that he hired Brewer to assault Turner, there was no evidence that he paid Brewer to kill Turner.  The evidence of Henry's contract with Brewer must be considered in context with Henry's admissions to the police.  These admissions provide substantial evidence from which a reasonable jury could find guilt beyond a reasonable doubt."[32] Dckt. No. 102 at 12.  Judge Singleton had declined to issue a certificate of appealability on this claim.  *Id.* at 13.  The Ninth Circuit also declined to grant a certificate of appealability on this claim.  Dckt. No. 114 at 3.  The Ninth Circuit then remanded the case solely for the purpose of conducting an evidentiary hearing on the specified ground that the testimony of Jeffrey and Austin, if truthful, would qualify petitioner to have made out a valid freestanding claim of

---

[32] This court notes that several words in the transcripts of petitioner's interview with the police were incorrectly transcribed, and that at least one statement that respondents contend is an admission that petitioner hired Brewer to shoot Turner is actually a denial.  However, ample evidence of petitioner's guilt remains.

1   innocence.  *Id.* at 4.  The Ninth Circuit's remand order does not allow this court to revisit

2   petitioner's claim that he is innocent even if Brewer killed Johnson.  Accordingly, this court does

3   not address this claim.

4   III.   <u>Actual Innocence – *Schlup v. Delo*</u>

5          Petitioner also argues that the prosecutor committed misconduct during closing argument

6   by speculating about facts not in evidence.  Dckt. No. 151 at 23.  A claim of actual innocence that

7   is accompanied "with substantial claims of constitutional violations at trial," may bring a habeas

8   petitioner within the "narrow class of cases . . . implicating a fundamental miscarriage of justice."

9   *Schlup v. Delo*, 513 U.S. 298, 315 (1995).  Unlike a *Herrera* claim, the "miscarriage of justice"

10  exception is not an independent avenue to relief.  Rather, if established, it functions as a

11  "gateway," permitting a habeas petitioner to have considered on the merits claims of

12  constitutional error that would otherwise be procedurally barred.  *See Schlup*, 513 U.S. at 315-16;

13  *Herrera*, 506 U.S. at 404.  A *Schlup* claim of innocence has a much lower threshold than a

14  *Herrera* freestanding actual innocence claim.  *Schlup*, 513 U.S. at 316.  Although petitioner

15  argues he has a *Schlup* claim of innocence, per the remand order, the issue before this court is

16  petitioner's *freestanding* actual innocence claim.

17         Nonetheless, even if the issue were before this court, petitioner would not be able to make

18  out a *Schlup* actual innocence claim because his claims were not procedurally defaulted.  All of

19  petitioner's claims were decided on the merits by Judge Singleton.  Further, the only relief that

20  petitioner would be entitled to if he prevailed on a *Schlup* claim would be to have his procedurally

21  defaulted claims considered on the merits, which Judge Singleton has already done.

22         Petitioner also asks the court to revisit his third and fourth claims–that there was

23  insufficient evidence at trial to prove that he hired Brewer to kill Turner, rather than just assault

24  him, and that the prosecutor misstated the evidence at his trial–under *Schlup*.  Pet'r's Post-Evid.

25  Hrg Br. at 26.  Petitioner notes that his fourth claim was not raised in his appeal to the Ninth

26  Circuit.  Dckt. No. 191 at 5.  Again, neither of these claims were procedurally defaulted.  Judge

Singleton considered them and rejected them on the merits.

CONCLUSION

As petitioner's witnesses at his evidentiary hearing were not credible, petitioner has not met his burden of affirmatively proving that he is probably innocent.  Therefore, petitioner cannot make out a valid freestanding claim of actual innocence.

Accordingly, it is hereby RECOMMENDED that:

1.  Petitioner's application for a writ of habeas corpus be denied;

2.  Petitioner's October 22, 2009 motion for bail be denied; and

3.  The Clerk be directed to enter final judgment in this matter.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated:  May 27, 2010.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE